# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| BETTY REICH, MARY PARHAM, and ALTHEA COOPER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ECOLAB, INC. and DOES 1-50 inclusive,<br><br>Defendant. | Case No.:<br><br><br><br><br>**CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs Betty Reich, Mary Parham, and Althea Cooper, by and through the undersigned counsels, individually and on behalf of all others similarly situated, brings this Complaint seeking judgment against Defendant Ecolab, Inc. (hereinafter "Defendant" or "Ecolab") for personal injuries sustained from Defendant's defective and unreasonably dangerous product, OxyCide™ Daily Disinfectant Cleaner ("OxyCide Cleaner") and OxyCide™ Dilution Management System (hereinafter collectively referred to as "OxyCide Cleaning Products" or "OxyCide"). At all relevant times, the OxyCide Cleaning Products were manufactured, designed, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted, distributed, and/or sold by Defendant.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   THE PARTIES ................................................................................................... 4

III.  JURISDICTION AND VENUE ........................................................................ 7

IV.   FACTUAL ALLEGATIONS ............................................................................ 7

      a.    OxyCide™ Daily Disinfectant and OxyCide Dilution Management System
            ............................................................................................................... 7

      b.    Plaintiff Betty Reich's Exposure to OxyCide Cleaning Products................. 9

      c.    Plaintiff Mary Parham's Exposure to OxyCide Cleaning Products........... 12

      d.    Plaintiff Althea Cooper's Exposure to OxyCide Cleaning Products ......... 13

      e.    Prior to Plaintiffs' Exposure to OxyCide Cleaning Products..................... 14

      f.    Ecolab's Defective OxyCide Cleaning Products ........................................ 15

      g.    Plaintiffs' Experiences Demonstrates a Dangerous Trend Among Persons
            Exposed to OxyCide Cleaning Products .................................................... 16

      h.    Investigations into OxyCide Cleaning Products ........................................ 18

      i.    Defendant Failure to Evaluate and Disclose the Health Risks Associated with
            OxyCide...................................................................................................... 21

      j.    NIOSH Recently Recommended Elimination or Substitution of OxyCide as
            a Primary Approach to Minimize Exposure Risk ...................................... 23

      k.    Plaintiffs' Experience Illustrates a Preventable Risk Caused by Ecolab's
            Failure to Implement Safeguards .............................................................. 27

      l.    Ecolab Misrepresented the Safety of OxyCide Cleaning Products............. 30

V.    CLASS ACTION ALLEGATIONS ................................................................. 31

VI.   CAUSES OF ACTION...................................................................................... 34

      COUNT I – STRICT LIABILITY – DESIGN DEFECT ..................................... 34

      COUNT II – STRICT LIABILITY – MANUFACTURING DEFECT .............. 37

      COUNT III – STRICT LIABILITY – FAILURE TO WARN............................ 39

      COUNT IV – NEGLIGENCE ............................................................................. 41

      COUNT V – BREACH OF EXPRESS WARRANTY ........................................ 45

      COUNT VI – BREACH OF IMPLIED WARRANTY ....................................... 47

      COUNT VII – INTENTIONAL MISREPRESENTATION ................................ 48

      COUNT VIII – NEGLIGENT MISPRESENTATION ........................................ 56

      COUNT XI – FRAUDULENT CONCEALMENT............................................. 59

i

COUNT XII – PUNITIVE DAMAGES ................................................................ 61

VII.    TOLLING OF STATUTES OF LIMITATIONS................................................... 62

VIII.   PRAYER FOR RELIEF....................................................................................... 63

IX.     JURY DEMAND.................................................................................................. 65

Plaintiffs Betty Reich, Mary Parham, and Althea Cooper, individually and on behalf of others similarly situated, hereby alleges as follows:

## I.   INTRODUCTION

1.     Plaintiffs Betty Reich, Mary Parham, and Althea Cooper ("Plaintiffs") bring this action against Ecolab, Inc., a multi-billion-dollar corporation which manufactures products for healthcare and industrial applications.  Specifically, Plaintiffs bring this action to redress Ecolab's use of dangerous chemicals and compounds in their OxyCide™ Daily Disinfectant Cleaner and OxyCide™ Dilution Management System.

2.     Since early 2013, when Ecolab first distributed its OxyCide Cleaning Products to over 500 hospitals nationwide, hospital workers have consistently and repeatedly reported serious physical injuries associated with the use of Ecolab's OxyCide Cleaning Products.  These included burning eyes, nose, and throat, nasal problems, cough, headache, dizziness, nausea, nose bleeds, asthma-like symptoms, respiratory irritation, skin burns, rashes and other reactions affecting their pulmonary and respiratory functions.

3.     Testing of chemical compounds in OxyCide Cleaning Products reveal the presence of dangerous chemicals and compounds that are known to cause adverse health effects.  Specifically, these tests revealed the presence of peracetic acid (also known as peroxyacetic acid, referred to hereinafter as "PAA"), a known asthmagen (asthma causing substance) and respiratory sensitizer (causing immune responses and adverse respiratory effects, even at low levels of exposure).

4.     Despite advance notices of complications arising from OxyCide Cleaning Products nationwide, Ecolab refused to take affirmative action to analyze, test, study,

1

and/or recall their products. Instead, Ecolab is content with endangering countless lives as Ecolab's products continue to be sold. In addition, despite advance notice of adverse health issues from OxyCide, Defendant continues to distribute OxyCide to hospitals nationwide.

5.     Plaintiff Betty Reich is a victim of Defendant's toxic and hazardous OxyCide Cleaning Products. Ms. Reich is an environmental services ("EVS") technician at Mercy One Hospital ("Mercy One') in Mason City, Iowa and has been employed at Mercy One for over fifteen (15) years. As an EVS technician, Ms. Reich is responsible for cleaning and disinfecting Mercy One hospital facilities using OxyCide Cleaning Products. Upon the initial exposure to OxyCide at Mercy One Hospital in or around 2018, Ms. Reich immediately began suffering from shortness of breath, coughing, burning eyes, runny nose, hoarse throat, loss of voice, upset stomach, headaches, and among other symptoms from exposure to the toxic chemical and/or combination of chemical agents. In or around January 2019, Mercy One Hospital eventually suspended the use of OxyCide Cleaning Products at the hospital due to complaints and inadequate ventilation. However, Ms. Reich continues to suffer from exposure to the OxyCide whenever she enters the hospital's supply closet, where MercyOne continues to store OxyCide Cleaning Products pending further investigation into the ventilation at the hospital. The closets in which the OxyCide Cleaning Products are stored as no ventilation system at all. Ms. Reich wishes to prevent others from suffering the devastating health consequences caused by the exposure to this product.

6.     Plaintiff Mary Parham is also a victim of Defendant's toxic and hazardous OxyCide Cleaning Products. Plaintiff Ms. Parham is an environmental services technician

at WellsStar Kennestone Hospital in Marietta, Georgia and has been working there since May 2019.  In or around May 20, 2019, when Ms. Parham first began working at WellsStar Kennestone Hospital, OxyCide Cleaning Products were already adopted for use throughout the hospital.  However, as soon as Ms. Parham was exposed to OxyCide, she immediately suffered from shortness of breath, coughing, burning eyes, running nose, nausea, headaches, hoarse throat, and loss of voice.

7.    After repeated exposure to OxyCide at the hospital, Ms. Parham's condition has worsened and now suffers from raw lips, sores on or in her mucous membranes, difficulty breathing, chest pains, difficulty sleeping, wheezing, frequent headaches, and numbness in her arms and fingers.  Ms. Parham also wishes to prevent others from suffering the devastating health consequences caused by OxyCide.

8.    Plaintiff Althea Cooper is another victim of Defendant's toxic and hazardous OxyCide Cleaning Products.  Like Plaintiff Mary Parham, Plaintiff Althea Cooper was a full-time environmental services employee at WellStar Kennestone Hospital located in Marietta, Georgia.  Ms. Cooper started working at WellStar Kennestone Hospital in or around May 20, 2019 and was responsible for performing terminal cleans of the hospital rooms throughout her shift.  Ms. Cooper used OxyCide exclusively for all her terminal cleans.  By Ms. Cooper's second day of working with OxyCide, she began to suffer from eye redness and irritation.  Her conditioned worsened after the first few weeks and began noticing that her hands and nails were beginning to split and crack, her nose was running more frequently, and she had difficulty breathing.  On or around October 11, 2019, Ms.

3

Cooper was forced to quit her job at the hospital due to her worsening health condition and concern for her long-term health.

9.      Through this action, Plaintiffs seek to certify a class action against Defendant for its liability in causing serious injuries to Plaintiffs, and behalf of other similarly situated. Plaintiffs also seek injunctive relief, ordering Defendant stop using the Product and/or to properly and adequately warn of the toxic chemicals in OxyCide Cleaning Products, as well as the significant risks of injury with exposure to the product.  Plaintiffs seeks that the warning be directed to hospitals, healthcare professionals, employees, and/or the general public at risk of exposure to the OxyCide Cleaning Products.

10.     Plaintiffs, individually and on behalf of the class of nationwide healthcare employees, also seeks compensatory, actual, and punitive damages for the harm suffered due to the foreseeable exposure to Ecolab's defective OxyCide Cleaning Products.

11.     Based on information and belief, the OxyCide Cleaning Products have not been recalled and continue to threaten the health and safety of hospital employees who are exposed to the toxic chemicals.

## II.    THE PARTIES

12.     Plaintiff Betty Reich is an individual who, at all times material hereto, was and is a resident and citizen of Iowa.  Plaintiff Betty Reich is an environmental services employee at Mercy One Hospital in Mason City, Iowa.   Ms. Reich has been working at Mercy One Hospital for over fifteen (15) years.

13.     Plaintiff Mary Parham is an individual who, at all times material hereto, was and is a resident and citizen of Georgia.  Plaintiff Mary Parham is an environmental

services employee ("EVS") at WellStar Kennestone Hospital in Marietta, Georgia. Ms. Parham has been working at WellStar Kennestone Hospital for over six (6) months.

14.    Plaintiff Althea Cooper is an individual who, at all times material hereto, was and is a resident and citizen of Georgia. Plaintiff Althea Cooper is an EVS employee at WellStar Kennestone Hospital in Marietta, Georgia. Ms. Cooper worked at WellStar Kennestone Hospital for almost five (5) months before leaving due to concerns for her health from continued and long-term exposure to OxyCide.

15.    Defendant Ecolab, Inc., is a Delaware corporation, with its headquarters and principle place of business located at 370 Wabasha Street N Saint Paul, Minnesota 55102-1323 and at all material times hereto, was and is doing business in the State of Minnesota. Defendant Ecolab, Inc. researches, designs, tests, inspects, manufactures, develops, produces, assembles, services, installs, distributes, markets, advertises, and/or sells a variety of water, hygiene, cleaning, and energy products globally. During the relevant time period described herein, Ecolab, Inc. designed, manufactured, produced, inspected, marketed, advertised, promoted, sold, and/or distributed OxyCide Cleaning Products at issue in this litigation.

16.    Defendant DOES 1-50 are the manufacturers, suppliers, distributors, trademark owners, re-packagers, and/or and joint ventures of defective and toxic chemical products and machines/equipment, including acetic acid and hydrogen peroxide-based products or PAA products to which Plaintiffs Betty Reich, Mary Parham, and Althea Cooper were exposed which were substantial factors in causing their serious and other consequential injuries.

17.     Defendant DOES 51-100 are companies, entities, individuals which otherwise were negligent or wrongful in their conduct toward Plaintiffs Betty Reich, Mary Parham, and Althea Cooper, which were thereby also substantial factors in causing their serious and other consequential injuries.

18.     The true names and capacities of Defendants DOES 1 through 100 are unknown to Plaintiffs, who therefore sue said Defendant by such fictitious names. Plaintiffs will amend this complaint to state the true names and capacities of said fictitious Defendants when they have been ascertained.  Plaintiffs are informed and believe and thereon allege that Defendants DOES 1 through 100 are in some manner responsible for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

19.     Plaintiffs are informed and believe and based thereon allege that, at all times material hereto, including the fictitiously named Defendants, were acting in an individual, corporate, partnership, associate, parent-subsidiary, successor-predecessor, conspiratorial or other capacity or as the agent, employee, co-conspirator, and/or alter ego of their co-Defendants, and in doing the acts herein alleged, were acting within the course and scope of their authority as such parent, successor, partner, associate, agent, employee, co-conspirator, or alter ego, and with the permission, consent, knowledge, authorization, ratification and direction of their co-Defendants, including all fictitiously named Defendants.

///

///

### III.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy as to Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because Defendant is a citizen of states other than the state in which Plaintiff is a citizen.

21.    Personal jurisdiction over Defendant is proper in the United States District Court for the District of Minnesota because Defendant: (a) has its principle place of business in the state of Minnesota; (b) conducted business in the state of Minnesota; (c) specifically transacted and conducted business in the state of Minnesota with respect to OxyCide Cleaning Products; and (d) have substantial and continuing contact with the state of Minnesota, thereby purposely availing themselves to jurisdiction in the state of Minnesota and submitting to the authority of the state of Minnesota.

### IV.    FACTUAL ALLEGATIONS

#### a.    OxyCide™ Daily Disinfectant and OxyCide Dilution Management System

22.    In or around 2013, Ecolab began manufacturing and marketing OxyCide™ Daily Disinfectant Cleaner, an EPA-registered non-bleach sporicide and virucide.  The main component in OxyCide Cleaner is PAA, a colorless liquid formed by the reaction of hydrogen peroxide and acetic acid.  PAA is known to be one of the strongest oxidizing agents.  OxyCide Cleaner's active ingredients when sold are PAA, hydrogen peroxide ("HP"), and acetic acid ("AA").  At dilution, the active ingredients are PAA and hydrogen peroxide.

23.     Ecolab advertises OxyCide Cleaner as a "One-stop hospital use disinfectant cleaner and deodorant designed for general cleaning, disinfecting and deodorizing of hard nonporous inanimate surfaces.  OxyCide Daily Disinfectant Cleaner is effective in three (3) minutes against Clostridium difficile (hereinafter "C. Diff.") spores."[1]  Ecolab claims that C. Diff. infections cost the healthcare industry $1.5 billion in annual expenditures.  Using this marketing and advertising, Ecolab has been able to sell and place OxyCide Cleaner in over 500 hospitals nationwide.

24.     Ecolab also manufactures the OxyCide™ Dilution Management System, an automated dispenser designed to dilute the concentrated OxyCide Cleaner with water to its at-use pH level of three (3).  The OxyCide Dilution System provides a safety feature where a locked compartment holds the OxyCide Cleaner concentrate and is attached to a suction line for quick and automated dilution.  The dilution system functions by introducing two liquid lines together in a controlled fashion to meet a specified diluted concentration.  A line supplies concentrated OxyCide Cleaner and another supplies water.  Ecolab advertises that with a single push of a button, safe, effective, and diluted OxyCide Cleaner disinfectant is dispensed for use.  Further, the product safety information states that OxyCide Cleaner does not require personal protective equipment when automatically diluted.

25.     The OxyCide Cleaning Products are catered toward industrial use and are not sold as household cleaning solutions due to their hazardous health effects from direct

---

[1] OxyCide Daily Disinfectant Cleaner, Ecolab, http://www.ecolab.com/offerings/concentrated-disinfectants/oxycide-daily-disinfectant-cleaner (last visited Apr. 3, 2018).

exposure, including severe burns, allergies, respiratory problems, and dangerous effects to the skin and eyes. Despite being a dangerous household agent, Ecolab markets their OxyCide Cleaning Products to hospitals nationwide as a safe and effective disinfectant, particularly against C. Diff bacterium, when compared to safer bleach cleaner alternatives.

26. In Europe, PAA is classified as a flammable liquid, organic peroxide, corrosive to skin, toxic to aquatic environment, and harmful by ingestion, inhalation and skin contact.

 

**b.    Plaintiff Betty Reich's Exposure to OxyCide Cleaning Products**

27. On information and belief, in or around October 17, 2018, Mercy One Hospital, first began adopting OxyCide Cleaning Products for use at its hospital located in Mason City, Iowa. Upon Plaintiff Betty Reich's first and immediate exposure to OxyCide in October 2018, she began to suffer from shortness of breath, coughing, eyes burning, nose running, hoarse throat, loss of voice, upset stomach, and headaches.

28.     Plaintiff was taken into the hospital's HealthWorks program for health services and was diagnosed with airway complications due to the chemical exposure to OxyCide.  Ms. Reich was put on an off-work order due to illness she suffered upon exposure to OxyCide until December 2018 Ms. Reich worked in textiles for three weeks before returning to her position in EVS.  Upon Ms. Reich's return to work in textiles, Ms. Reich did not regain her full voice but her other symptoms were alleviated when she was no longer exposed to OxyCide.

29.     On information and belief, in or around January 2019, Mercy One Hospital placed OxyCide Cleaning Products on suspension pending its investigation of the hospital's inadequate ventilation systems.  In the meantime, while OxyCide was on suspension, the OxyCide Cleaning Products and dispensing machines remained stored in the EVS closets.  While on suspension, EVS workers utilized a combination of two chemical cleaning agents, also manufactured by Ecolab: (1) Neutral Disinfectant Cleaner and (2) 73 Disinfecting Acid Bathroom Cleaner.

30.     In or around May 2019, Ms. Reich's experienced her second incident with OxyCide exposure which made her ill again.  In May 2019, Ms. Reich was exposed to OxyCide Cleaning Products when she was assisting an EVS co-worker with a cleaning job in the hospital.  Upon opening the cleaning closet located on the hospital's floor where Ms. Reich was assisting her co-worker, Ms. Reich immediately experienced shortness of breath, coughing, nausea, burning eyes, burning, runny nose, loss of voice, and her skin became pale.  The cleaning closet was storing the OxyCide Cleaning Products. Ms. Reich's

co-worker witnessed Ms. Reich's immediate reaction to the OxyCide Cleaning Products. Ms. Reich reported her injuries to her supervisors and was sent home.

31.   In or around September 26, 2019, Ms. Reich experienced her third incident when she opened the hospital storage closet containing OxyCide and was exposed to its fumes and vapors.  Ms. Reich, again, immediately suffered from shortness of breath, coughing, nausea, burning eyes and nose, running nose, and loss of voice.  Ms. Reich sought medical attention and her doctors related her illness to work related chemical exposure.

32.   After repeated exposure to OxyCide Cleaning Products, Ms. Reich's health has worsened.  Ms. Reich now suffers from constant shortness of breath when walking, even on short distances from walking to and from the hospital parking lot when reporting for or returning from her shift.  In addition, despite having no history of asthma or allergies, Ms. Reich is now on an albuterol inhaler and other asthma and allergy medications.

33.   In December 2019, Ms. Reich was referred to another allergist for a second opinion, Dr. P. Hartely, located in Mason City, Iowa, who diagnosed her with occupational asthma caused by chemical exposure at work to OxyCide Cleaning Products.  Dr. Hartely informed Ms. Reich that even in the absence of continued exposure to the OxyCide Cleaning Products, it would take at least two years for damages caused by OxyCide

34.   On information and belief, Ms. Reich's symptoms are not isolated instances, but rather other employees at Mercy One Hospital have also suffered from similar symptoms from exposure to OxyCide and were put on off-work orders.  Dr. Hartely

informed Ms. Reich that she was the third employee he treated for injuries due to OxyCide exposure.

35.    On information and belief, Mercy One Hospital recently banned the use of OxyCide Cleaning Products indefinitely due to complaints and inadequate ventilation.

**c.    Plaintiff Mary Parham's Exposure to OxyCide Cleaning Products**

36.    In or around May 20, 2019, Plaintiff Mary Parham began working as an EVS employee at WellStar Kennestone Hospital located in Marietta, Georgia.  Ms. Parham works full time and is responsible for performing "terminal cleans" of the hospital facilities using OxyCide Cleaning Products.  Terminal cleaning is a cleaning method used in healthcare environments to control the spread of infections.  Terminal cleaning methods vary, but usually include removing all detachable objects in the room, cleaning lighting and air duct surfaces in the ceiling, and cleaning everything downward to the floor.  Ms. Parham was required to exclusively use OxyCide to perform all terminal cleans.

37.    On information and belief, WellStar Kennestone Hospital was introduced and used throughout the hospital prior to Ms. Parham's employment.  Ms. Parham was trained to use OxyCide through the hospital orientation and training program on her first day.  During the training program, several other employees complained to their supervisors about the irritating effect of OxyCide on their bodies.

38.    In or around May 20, 2019, upon Ms. Parham's initial exposure to OxyCide Cleaning Products, she began experiencing difficulty breathing, nausea, running nose, burning lips, burning eyes, and coughing.

39.     After repeated daily exposure to OxyCide at the hospital, Ms. Parham's condition has worsened.  Ms. Parham as developed raw lips, sores, difficulty breathing, chest pains, wheezing, difficulty sleeping, frequent headaches, and numbness in her arms and fingers.

40.     Ms. Parham has tried to minimize her exposure to OxyCide Cleaning Products by using gloves and breathing masks; however, these solutions have little to no effect of preventing her chronic symptoms, and in fact are worsening.

**d.     Plaintiff Althea Cooper's Exposure to OxyCide Cleaning Products**

41.     In or around May 20, 2019, Plaintiff Althea Cooper began working at WellStar Kennestone Hospital as an EVS technician.  Like Ms. Parham, Ms. Cooper was responsible for performing terminal cleans of the hospital rooms on a regular basis and used OxyCide Cleaning Products to disinfect all surfaces.  Ms. Cooper underwent training at the hospital to use OxyCide Cleaning Products when she first started working and recalls claims that OxyCide's vinegar smell is the "smell of clean."

42.     After Ms. Cooper's second day of working at the hospital, she began to experience eye irritations and redness.

43.     In or around June 2019, Ms. Cooper complained to her supervisor that the chemicals were irritating her eyes and her nails were split and the skin around her nails was cracked and dry from the use of OxyCide.  Her supervisor suggested that Ms. Cooper wear additional protective gear; however, even with eye protection and donning two gloves, her condition still worsened.

44.     In or around October 11, 2019, Ms. Cooper was forced to quit her job as her health condition continued to worsen due to constant exposure to OxyCide Cleaning Products.  Due to rumors of other EVS employees being terminated after complaining about the harmful effects of OxyCide, Ms. Cooper felt it was best to terminate her employment with WellStar Hospital rather than risk termination for formerly reporting her symptoms through the workers' compensation system at her employment.

45.     After Ms. Cooper quit her job, within two to three weeks, her symptoms improved and the redness in her eyes began to clear up.  Ms. Cooper's breathing has also improved and is no longer wheezing; however, Ms. Cooper's nails are permanently split and damaged.

**e.     Prior to Plaintiffs' Exposure to OxyCide Cleaning Products**

46.     Prior to Plaintiff Betty Reich' exposure to OxyCide Cleaning Products, Plaintiff was in good health with no major health diagnosis.

47.     Plaintiff Ms. Reich worked at Mercy One Hospital for over fifteen years and did not have health issues associated with any of the chemicals used at the hospital until October 2018, when OxyCide Cleaning Products were introduced.

48.     Prior to Plaintiff Mary Parham's exposure to OxyCide Cleaning Products, she too was healthy with no major health concerns.  Ms. Parham has no history of allergies or asthma and was in good health prior to working with OxyCide Cleaning Products.  However, as she continued to be exposed to OxyCide, her health has progressively and consistently worsened.

14

49.    Prior to Plaintiff Althea Cooper's exposure to OxyCide Cleaning Products, she was healthy with no major health concerns.  Ms. Cooper did not have allergies, asthma, or any sensitivity to chemicals in the past.  However, as she continued to be exposed to OxyCide, her health progressively worsened.

**f.    Ecolab's Defective OxyCide Cleaning Products**

50.    Based on information and belief, at all times relevant herein, hospital employees were trained to use the OxyCide Cleaning Products in accordance with Ecolab's instructions for use and listed safety instructions.

51.    On information and belief, the OxyCide Cleaner was connected to the OxyCide Dilution System and locked in accordance with all safety precautions and methodologies provided by the Ecolab.

52.    On information and belief, at all times relevant herein, Plaintiffs performed their job duties with the diluted OxyCide Cleaner from the OxyCide Dilution System which was dispensed into an appropriate container in accordance with the instructions and warnings provided by the Ecolab.  Plaintiffs did not change or modify the automated dilution system and abided by all pertinent safeguards.

53.    However, due to Ecolab's defective OxyCide Cleaning Products, Plaintiffs inhaled the vapors of OxyCide's toxic chemicals causing them to immediately suffer respiratory problems, shortness of breath, chest pain, burning eyes and throat, headaches, dry and/or damaged mucous membranes, runny nose, cough, nausea, and/or other symptoms.

54.     On information and belief, other hospital employees have experienced similar complaints as Plaintiffs herein.  Other employees at hospital facilities throughout United States, including Plaintiffs, complained about the caustic smell, irritations, and respiratory side effects from the OxyCide cleaning agents used at the hospitals and notified management.

55.     Plaintiffs would not have suffered such immediate serious injuries without Ecolab's negligence in manufacturing, designing, engineering, developing, producing, assembling, equipping, testing, inspecting, repairing, retrofitting, labeling, warning, advertising, marketing, supplying, distributing, wholesaling, and/or selling the defective OxyCide Cleaning Products and/or OxyCide Dilution System.

56.     Plaintiffs also would not have suffered such serious injuries had Ecolab revealed necessary information regarding the hazardous OxyCide Cleaning Products and taken necessary precautions and ceased use of OxyCide Cleaning Products following serious health related complaints.

     **g.**     **Plaintiffs' Experiences Demonstrates a Dangerous Trend Among Persons Exposed to OxyCide Cleaning Products**

57.     Since OxyCide's introduction at hospitals throughout the United States, there have been numerous reports of employees developing serious health related issues concerning OxyCide, including difficulty breathing, shortness of breath, nausea, vomiting, burning eyes, burning throat, bronchospasms, and/or vocal cord stridor.

58.     Despite repeated complaints and injuries from using OxyCide Cleaning Products, Defendant continued to market the hazardous products and took no action.

59.     Prior to Plaintiffs' incidents, and despite all of the complaints from employees of feeling ill after being exposed to the products, Ecolab repeatedly told Plaintiffs and other hospital employees that OxyCide Cleaning Products were safe despite knowledge to the contrary.

60.     Plaintiffs' experiences were not isolated experiences nor were they unavoidable.  In 2015, over 200 healthcare workers at the University of Pittsburgh Medical Center ("UPMC") filed a complaint with the Division of Occupational Safety and Health Administration ("OSHA") to open an investigation.  The healthcare workers complained of adverse health effects, including headaches, nausea, difficulty breathing, among other side effects resulting from OxyCide Cleaning Products.

61.     On information and belief, in or around February 2016, a registered nurse at the Kaiser facility in Fontana, California suffered a similar, but more severe reaction to OxyCide.  The nurse was about ten (10) feet away from a patient room being cleaned with OxyCide when she began experiencing a burning sensation in her nose and lungs, difficulty breathing, coughing, and had ultimately collapsed from respiratory failure.  The nurse was admitted to the hospital and kept in the intensive care unit for five (5) days.  The nurse was diagnosed with vocal cord dysfunction, bronchospasm, acute respiratory failure, and severe chemical burns in her throat, which required several surgeries and a tracheostomy.  The damage she sustained due to OxyCide exposure is permanent.

62.     On information and belief, ChemDAQ, a company devoted to ensuring occupational safety in diverse markets such as the healthcare industry, researched the effects of PAA and found that continued exposure to PAA can result in liver and kidney

17

problems, pulmonary edemas and circulatory problems that can go undetected for months or years.  ChemDAQ and other industry experts note flaws in OSHA's investigation due to its methodology for measuring PAA concentrations.  At the time of the investigation, OSHA did not have a standard in place for analyzing PAA.  The problem is illuminated when OSHA only examines hydrogen peroxide and acetic acid individually, which are not as harmful as when they are combined to create PAA.  In May 2015, ChemDAQ released a comment urging companies to install accurate monitoring systems to detect PAA concentrations.

### h.    Investigations into OxyCide Cleaning Products

63.    Multiple studies have been undertaken regarding Ecolab's OxyCide Cleaner and PAA-based disinfectants, particularly the long-term health effects from exposure to the product.[2]

64.    In spring of 2014, the American Conference of Governmental Industrial Hygienist ("ACGIH") set a Short-Term Exposure Limit (STEL) on PAA at 0.4 parts-per-million ("ppm"), confirming its dangers in the workplace.[3]

65.    In 2015, the Association of Occupational and Environmental Clinics ("AOEC") listed PAA and hydrogen peroxide as strong oxidants and their mixture is listed

---

[2] Emmanuelle Cristofari-Marquand et al., *Asthma Caused by Peracetic Acid-Hydrogen Peroxide Mixture*, 49 J. OCCUP. HEALTH 155 (2007), http://joh.sanei.or.jp/pdf/E49/E49_2_11.pdf.

[3] Adrea Tritschler, *Disinfectant Designed for Patient Health Could be Making Health Workers Sick*, RIVER CURRENTS (Feb. 2016), http://riverwestcurrents.org/2016/02/disinfectant-designed-for-patient-health-could-be-making-health-workers-sick.html (emphasis added).

as an asthmagen and respiratory sensitizer.  According to NIOSH, asthmagens are substances that can cause asthma, and respiratory sensitizers are substances that can cause an immune response and adverse respiratory effects, even at low levels of exposure[1].

66.     The AOEC clarified that an

> [I]ndividual may develop asthma due to exposure to a sensitizing agent at very low levels of exposure, and this condition may become permanent and require treatment even after exposure has stopped.  The longer an individual is exposed to an asthmagen, the greater the risk of developing asthma.     The person must be exposed to the chemical/substance that caused the initial reaction.  This is not a list of substances that aggravate an individual's asthma, but a list of substances that *cause* asthma.[4]

67.     In 2015, the National Institute for Occupational Safety and Health (NIOSH) conducted a health hazard investigation after healthcare workers at Magee-Women's Hospital in Pittsburgh, Pennsylvania,  contacted the agency and expressed concerns about the reaction to the new sporicidal disinfectant product called OxyCide used at its facility.[5] Employees complained of symptoms that included burning eyes, nose, and throat; runny nose; cough; headache, dizziness; nausea; nose bleeds; asthma exacerbation; skin burns; and rashes.  NIOSH found that OxyCide users reported higher prevalence of work-related

---

[4] Gary Evans, *Healthcare Dilemma: Kill the Bugs But Spare the Workers*, AHC MEDIA (Aug. 1, 2016) https://www.ahcmedia.com/articles/138245-protect-patients-harm-workers-cleaning-agent-raises-concerns.

[5] Brie Hawley et al., *Evaluation of Exposure to a New Cleaning and Disinfection Product and Symptoms in Hospital Employees*, NIOSH (Jan 2017), https://www.cdc.gov/niosh/hhe/reports/pdfs/2015-0053-3269.pdf; Gary Evans, *Healthcare Dilemma: Kill the Bugs But Spare the Workers*, AHC MEDIA (Aug. 1, 2016) https://www.ahcmedia.com/articles/138245-protect-patients-harm-workers-cleaning-agent-raises-concerns.

health outcomes including cough, shortness of breath, asthma-like symptoms, asthma attack, use of asthma medicine, asthma symptoms, use of allergy medicine, nasal problems, and skin problems, with wheeze and watery eyes being significantly higher in OxyCide users than non-users. EVS Staff Workers using OxyCide had reported acute eye and airway symptoms, as well as chronic airway symptoms at low levels of measured exposures. NIOSH reported that shortness of breath was significantly associated with increased exposure to PAA, hydrogen peroxide, and acetic acid. All the active ingredients in concentrated and diluted solutions of OxyCide Cleaner show that increased exposure to PAA, hydrogen peroxide, and acetic acid significantly correlated with increases in work-shift acute nasal and eye irritation and shortness of breath.

68. On April 12, 2016, NIOSH released an interim report concluding that the "findings support the conclusion that exposure to OxyCide is associated with adverse health effects and indicate the need to minimize employee exposures."[6]

69. In or around 2017, NIOSH conducted an investigation of OxyCide at the Kaiser Permanente Fontana Medical Center after a serious work-related injury occurred relating to OxyCide and a nursing staff. During its investigation, NIOSH conducted interviews with eleven (11) EVS staff, ten (10) nursing staff, and six (6) ancillary staff. Of the eleven (11) EVS staff interviewed five (5) reported burning eyes, and six (6) reported nasal irritation, coughing, sneezing, headache, and burning throat. Two (2) EVS staff

---

[6] Brie Hawley et al., *Evaluation of Exposure to a New Cleaning and Disinfection Product and Symptoms in Hospital Employees*, NIOSH (Jan 2017), https://www.cdc.gov/niosh/hhe/reports/pdfs/2015-0053-3269.pdf.

reported previous chemical splashes or skin burns.  Six (6) of ten (10) nursing staff reported headache, eyes burning, throat irritation, coughing, nausea, or shortness of breath.  NIOSH also took measurements of the pH levels of diluted OxyCide and found that the pH varied significantly from 3.1 to 7.5 pH.

### i.    Defendant's Failure to Evaluate and Disclose the Health Risks Associated with OxyCide

70.    Ecolab's Safety Data Sheet for PAA exposure only provides ACGIH's Short Term Exposure Limit or STEL at 0.4 ppm, which is only calculated as a 15-minute time weighted average.  Ecolab failed to investigate, determine, and disclose the health risks associated with short and long-term PAA exposure, particularly in occupational and industrial settings, where Ecolab specifically markets their OxyCide Cleaning Products and provide the OxyCide Dilution System in conjunction with their OxyCide Cleaning Products

71.    Ecolab knew, or should have known, about the health concerns surrounding OxyCide Cleaning Products from various public health reports, hospital-staff employee complaints, and internal complaints.  Yet, Ecolab willfully or negligently declined to investigate and disclose the serious health risk to healthcare professionals and the general public, disregarded well-founded complaints, and chose to continue to risk the health of the public despite the availability of less-harmful cleaning agents.  This knowledge was exclusively in the hands of Ecolab.

72.    To date, no occupational exposure limits have been established for PAA. There is limited data on PAA's exposure limits and occupational hazards for exposure to

the mixture of PAA, hydrogen peroxide, and acetic acid. Most exposure limit values are created for exposure to a single chemical substance. At present, there are no OSHA Permissible Exposure Limits ("PEL") or NIOSH Recommended Exposure Limits ("REL") studies for occupational exposure to PAA.

73.    Further, PAA is a very potent irritant at considerably lower concentrations compared to hydrogen peroxide and acetic acid. The methodology of testing occupational exposure utilized by OSHA only takes into account hydrogen peroxide and acetic acid individually, but not when combined to create PAA, which is significantly more hazardous.

74.    On information and belief, current analytical methodologies are not adequately quantifying the PAA levels and/or the recommended occupation exposure limits are not protective enough to ensure consumer/employee safety.

75.    NIOSH has reported that "[f]ew assessments of worker exposure to hydrogen peroxide, acetic acid, and peroxyacetic acid in healthcare settings have been conducted, despite the use of this product in more than 500 hospitals nationally."[7]

76.    In NIOSH's evaluation, EVS Staff Members reported work-related symptoms despite measured air sampling exposures that were below the established full-shift limits for hydrogen peroxide and acetic acid. However, because both hydrogen peroxide and PAA are strong oxidants, it is possible that the mixture of hydrogen peroxide and PAA contributed to the symptoms reported by workers.

---

[7] Brie Hawley, PhD et al., *Notes from the Field: Respiratory Symptoms and Skin Irritations Among Hospital Workers Using a New Disinfection Product – Pennsylvani*a 2015, MORBIDITY & MORTALITY WKLY. REP., Apr. 22, 2016, https://www.cdc.gov/mmwr/volumes/65/wr/mm6515a3.htm.

77.    In 2010, the National Research Council issued a report stating "Peracetic acid is extremely irritating to mucous membranes of the eyes and nasal passages at low concentrations."[8]

78.    On information and belief, Ecolab knew, or should have known, about the increased concerns regarding the OxyCide Cleaning Products.  Ecolab willfully and/or negligently ignored persistent warnings and failed to undertake investigations to determine the health risk associated with OxyCide.  Ecolab failed to perform necessary evaluations to ensure that the OxyCide Cleaning Products are safe for use in the hospital setting.

**j.    NIOSH Recently Recommended Elimination or Substitution of OxyCide as a Primary Approach to Minimize Exposure Risk**

79.    Recently, in September 2019, the U.S. Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") – National Institute for Occupational Safety and Health ("NIOSH") issued Report No. 2017-011403357 entitled "Evaluation of exposure to hydrogen peroxide, peracetic acid, and acetic acid containing cleaning and disinfection product and symptoms in hospital employee" pursuant to its Health Hazard Evaluation Program ("HHE")[9].  The HHE was a response to a confidential employee request for NIOSH to conduct the HHE at a Kaiser Hospital, located in Fontana, California, which is encompassed in Kaiser's Southern California Region.

---

[8] NATIONAL RESEARCH COUNCIL, ACUTE EXPOSURE GUIDELINE LEVELS FOR SELECTED AIRBORNE CHEMICALS: VOLUME 8, NATIONAL ACADEMIES PRESS 333 (2010), https://www.nap.edu/catalog/12770/acute-exposure-guideline-levels-for-selected-airborne-chemicals-volume-8.
[9] HHE Report 2017-0114-3357 is available at http://www.cdc.gov/niosh/hhe/reports/pdfs/2017-0114-3357.pdf (last visited December 13, 2019.)

80.    The request for the HHE cited "concerns about exposure of hospital employees to OxyCide, and described symptoms experienced by employees, including respiratory distress, skin problems, headaches, chest tightness, burning eyes, sore throat, and nausea."[10]  NIOSH visited the Kaiser hospital in August 2017 to observe EVS staff while they conducted cleaning tasks with OxyCide Product throughout the hospital. NIOSH collected 14 bulk samples of the diluted OxyCide Product in August 2017 to measure pH levels and returned again one year later in multiple visits to perform air sampling and health questionnaire surveys. [11]  NIOSH linked the symptoms experienced by the employees with exposure to the mixture of vapors found in OxyCide Products.  It is undisputed that irritant and allergic effects can occur with disinfectant chemical air concentrations at levels below OSHA or NIOSH exposure limits.[12]

81.    In its report, NIOSH cited studies that found occupational upper respiratory disease such as allergic rhinitis and sinusitis is often more prevalent than occupational asthma and several studies suggest that rhinosinusitis might precede or occur with lower respiratory symptoms and asthma.[13]   Additionally and importantly, upper respiratory involvement can result in suboptimal control of asthma.[14]  Although the HP and PAA levels measured in the HHE were below the established occupational exposure limits, NIOSH still observed health effects among employees because both HP and PAA are strong

---

[10] *Id.* at p. i.
[11] *Ibid.*
[12] *Id.* at p. 24.
[13] *Id.* at p. 23.
[14] *Ibid.*

oxidants, the mixture of which potentially contributed to the eye and airway symptoms reported by staff at the relatively low levels of measured exposure.[15]

82.    NIOSH's findings are consistent with Plaintiffs' symptoms: they found that some employees using OxyCide reported "eye, upper respiratory, lower respiratory and skin symptoms that began during their shift."[16]  NIOSH found that "increased exposure to hydrogen peroxide, peracetic acid, or acetic acid vapors [OxyCide's chemical compounds] was associated with increases in acute, cross-shift work related nasal irritation, eye irritation, shortness of breath, and wheeze symptoms reported by hospital staff" after adjusting for age, gender, smoking status, allergic status, other sensitizer or irritant containing cleaning products used during their shift, and stress.[17]

83.    These results, according to NIOSH, indicates a need to: (1) monitor eye, respiratory, and skin symptoms among hospital cleaning staff using any cleaning products containing OxyCide's mixture, and (2) use a combination of engineering, administrative and personal protective equipment ("PPE") controls to reduce employee exposure.[18]

84.    NIOSH's primary approach to minimizing exposure risk to these harmful chemicals is to "eliminate hazardous materials or processes", however the choice to use sporicidal disinfectants like OxyCide in specific areas of the hospital should "be prudent and reflect the level of risk of healthcare-acquired infection."[19]   In the absence of

---

[15] *Ibid.*
[16] *Id.* at p. ii.
[17] *Id.* at pp. ii-iii.
[18] *Id.* at p. 25.
[19] *Ibid.*

elimination, NIOSH recommends engineering controls to reduce employees' exposures by lowering air concentrations with increased ventilation or by placing a barrier between the hazard and the employee, and such controls *should not* task the employee with primary responsibility for implementation.[20]

85.     In addition to engineering controls, NIOSH recommends that the employers implement a comprehensive system for reporting and tracking workplace injuries and illnesses that includes reports of near misses, minor injuries and illnesses, and employee safety concerns.[21]  NIOSH believes such information should be reviewed by the Safety Officer on a regular basis to identify hazards, implement risk-reduction strategies, and prevent significant injuries and illnesses.[22]

86.     What NIOSH strongly recommends is NOT placing the burden of safety precautions on the employee when using OxyCide.  NIOSH warns that "personal protective equipment is the least effective means for controlling hazardous exposures."[23]  Rather, personal protective equipment should not be used until effective engineering and administrative controls are in place.[24]  In fact, NIOSH observed some EVS staff using surgical masks or the N95 respirator mask for the purpose of respiratory protection while dispensing or working with the Products.[25]  However, NIOSH warns "these types of masks do not provide adequate, validated respiratory protection while working with products that

---

[20] *Ibid.* (emphasis added.)
[21] *Id.* at p. iii.
[22] *Ibid.*
[23] *Id.* at p. 27
[24] *Ibid.*
[25] *Id.* at p. 24.

26

release gases or chemical vapors."[26]  Specifically, the N95's effectiveness at mitigating worker exposure to the organic vapors contained in OxyCide has not been validated and therefore should not be relied upon as a means of airway/respiratory protection.[27]

### k.    Plaintiffs' Experience Illustrates a Preventable Risk Caused by Ecolab's Failure to Implement Safeguards

87.    On information and belief, Ecolab was on notice of serious health risks and defects in their OxyCide Cleaning Product line shortly after its introduction.  Had Ecolab implemented readily available engineering and administrative safeguards and adequate warnings, Plaintiffs would not have endured serious and permanent injuries.

88.    Ecolab misrepresented the safety and soundness of the OxyCide Cleaning Product for use in institutions, such as healthcare settings.

89.    Ecolab failed to provide adequate engineering and administrative controls and/or adequately warn healthcare professionals and the general public within the vicinity of the OxyCide Cleaning Product's use to wear necessary protective garments and masks, or to clean with the Product only in a well-ventilated area.

90.    The New Jersey Department of Health and Senior Services reported that PAA (Peroxyacetic Acid), the active ingredient in OxyCide Cleaning Products, "is a HIGHLY CORROSIVE CHEMICAL and contact can severely irritate and burn the skin and eyes leading to eye damage.  Breathing Peroxyacetic Acid can irritate the nose and throat.  Breathing Peroxyacetic Acid can irritate the lungs causing coughing and/or

---

[26] *Ibid.*
[27] *Ibid.*

shortness of breath.  Higher exposures can cause a build-up of fluid in the lungs (pulmonary edema), a medical emergency, with severe shortness of breath."[28]

91.    Ecolab's OxyCide Safety Data Sheet states that when the product is as sold, inhalation is "[t]oxic if inhaled.  May cause nose, throat, and lung irritation."

92.    Had Ecolab provided adequate engineering and administrative safeguards and warnings, Plaintiffs would have undertaken necessary precautions when around OxyCide Cleaning Products to protect themselves from its hazardous chemicals.

93.    Ecolab also failed to reasonably analyze the occupational exposure limits for PAA despite knowing or reasonably knowing hospital workers nationwide were experiencing serious respiratory, asthma, eye and skin complications as a result of the OxyCide Cleaning Products.  Instead, Ecolab was content with stating that no special protective equipment is required to protect users from diluted OxyCide Cleaner, as long as their products were being sold on the market and met OSHA or NIOSH exposure limits.

94.    Ecolab's Safety Data Sheet only states the short-term exposure limit for PAA is at 0.4 parts per million.  Ecolab failed to investigate safety concerns regarding their OxyCide Cleaning Products and possible long-term exposure complications even after complaints of harmful effects suffered by employees from the use of the OxyCide Cleaning Products.

---

[28] HAZARDOUS SUBSTANCE FACT SHEET, PEROXYACETIC ACID, NEW JERSEY DEPARTMENT OF HEALTH & SENIOR SERVICES (Mar. 1998, Rev. Oct. 2004), http://nj.gov/health/eoh/rtkweb/documents/fs/1482.pdf.

95.    Further, PAA monitoring systems are readily available on the market and provide immediate indication of PAA concentrations in the work area, so that workers can protect themselves from acute and chronic exposure to PAA.  Continuous monitoring of PAA can help protect employees from the acute and chronic health affects by reporting the toxic concentrations in real time and providing alarms for proactive protection.

96.    A continuous monitoring system, adequate ventilation, along with a comprehensive education and reporting program and safe work practices are quick methods to assure worker safety and maximize productivity.

97.    On information and belief, Ecolab failed to recommend and/or require accurate PAA monitoring systems to ensure consumer and user safety to prevent acute or chronic exposure to hazardous chemicals from their defective OxyCide Cleaning Products. In fact, Ecolab's Safety Data Sheet states no special monitoring, ventilation, engineering safeguards and/or protective equipment required for eye, hand, skin, and respiratory protections.  Had Ecolab acted reasonably to safeguard their consumer, employee, and/or the general public's health and offer a solution to ensure safe PAA levels, Plaintiffs would not have endured serious and permanent injuries.  A PAA monitor would have necessarily provided accurate and advanced warnings of any defective OxyCide Cleaning Products. Had Ecolab provided adequate product warnings or required PAA monitoring systems and disclosed the need for engineering and administrative safeguards, Plaintiffs would have had limited hazardous OxyCide exposure and advanced warning to leave the hazardous area in the absence of such safeguards.

///

### l.       Ecolab Misrepresented the Safety of OxyCide Cleaning Products

98.     On information and belief, Ecolab made material misrepresentations, fraudulently concealed information, and/or and intentionally omitted material information to healthcare professionals, Plaintiffs, government officials, and/or the general public, causing serious and permanent damage to Plaintiffs, and others similarly situated.

99.     On information and belief, Ecolab falsely marketed its OxyCide Cleaning Products as a safe and effective disinfectant to healthcare professionals, consumers, Plaintiffs, and/or the general public, despite knowledge to the contrary.

100.    On information and belief, Ecolab's Safety Data Sheet misrepresented that OxyCide Cleaner does not require personal protective equipment or engineering safeguards when automatically diluted, despite knowledge to the contrary.

101.    On information and belief, Ecolab misrepresented in marketing and advertising claims that a low incidence of side effects was associated with the use of OxyCide Cleaning Products.

102.    On information and belief, Ecolab misrepresented the adverse results of clinical investigations of OxyCide Cleaning Products.

103.    Plaintiffs would not have suffered such serious injuries had Defendant revealed necessary information regarding the hazardous OxyCide Cleaning Products, taken necessary precautions, and/or ceased use of OxyCide Cleaning Products following serious health related complaints.

///

///

## V.    CLASS ACTION ALLEGATIONS

104.    Plaintiffs brings this action on their own behalf, and on behalf of a nationwide pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).

> All persons in the United States who are current or former hospital employees exposed to OxyCide Cleaning Products within four years prior to the filing of this action.

105.    Excluded from the Class is Defendant, its affiliates, officers and directors, and the Court.  Plaintiffs reserves the right to modify, change, or expand the Class definition on discovery and further investigation.

106.    **Numerosity:**  Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identities of the individual Members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class Members are the subjects of the Class.

107.    **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual class members.  These common legal and factual questions include, but are not limited to, the following:

a.    Whether Defendant marketed OxyCide Cleaning Products as safe for use;

b.    Whether Defendant's claims alleged herein are untrue, misleading, or reasonably likely to deceive;

c.    Whether Defendant concealed or omitted a material fact or facts;

d.      Whether OxyCide Cleaning Products are unreasonably dangerous products;

e.      Whether OxyCide, if used as intended, causes injury;

f.      Whether Defendant adequately warned of the hazardous effects of OxyCide Cleaning Products; Whether Defendant sold the OxyCide Cleaning Products with a defect;

g.      Whether Plaintiffs and Class Members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and the amount and nature of such relief to be award to Plaintiffs and the Class; Whether Defendant, through its conduct as alleged herein, received money that, in equity and good conscience, should be disgorged as unjust profits;

h.      Whether Plaintiffs and the proposed members of the Class are entitled to injunctive relief, restitution, and/or disgorgement of Defendant's ill-gotten gains.

108.    **Typicality**:  All of Plaintiffs' claims are typical of the claims of the Class in as much as Plaintiffs, like all other class members, has sustained damages arising from Defendant's violations of the law, as alleged herein.  The representative Plaintiffs and the class members were similarly harmed by the same unlawful, unfair, and systematic pattern of misconduct engaged in by Defendant.

109.    **Adequacy:**  Plaintiffs are adequate representatives because they will fairly and adequately represent and protect the interest of the Class and their interests do not conflict with the interests of the Class that they seek to represent.  Plaintiffs have retained counsel competent and highly experienced in complex class action litigation, and they

intend to prosecute this action vigorously. There are no material conflicts between the claims of the representative Plaintiffs and the class members that would make class certification inappropriate.

110. **Superiority**: This suit may be maintained as a class action because questions of law and fact common to the class predominate over the questions affecting only individual members of the class and a class action is superior to other available means for the fair and efficient adjudication of this dispute. Further, it would be virtually impossible for class members to individually redress effectively the wrongs done to them. Even if class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's business records, sales data, training records, and/or database of complaints.

111. Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

///

# VI.    CAUSES OF ACTION

## COUNT I – STRICT LIABILITY – DESIGN DEFECT

112.    Plaintiffs incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

113.    Plaintiffs are informed and believe and based thereon alleges that Ecolab, designed, manufactured, researched, tested, assembled, installed, marketed, advertised, distributed, instructed, warned, and sold OxyCide Cleaning Products.

114.    At all times relevant hereto, Ecolab knew that the OxyCide Cleaning Products would be operated and used by healthcare professionals nationwide without inspection for defects.

115.    At the time of the incident described above, the OxyCide Cleaning Products were being used in a manner and fashion that was foreseeable by Ecolab, and in a manner in which it was intended to be used.

116.    Ecolab designed, engineered, developed, manufactured, produced, assembled, equipped, tested, or failed to test, inspected or failed to inspect, repaired, retrofitted, or failed to retrofitted, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, instructed on use, warned, and sold the cleaning products and its component parts and constituents, which was intended by Ecolab to be used for the purposes of use as a disinfectant, and other related activities.

117.    As a direct and proximate result of said design defects, while using said toxic chemical product and machines and PAA containing products in a manner that was reasonably foreseeable and intended by Ecolab, Plaintiffs were exposed to toxic chemicals

released from each of said toxic chemical products, and machines and the PAA containing products, and a result, suffered serious injuries and medical conditions.

118.    Ecolab designed the cleaning products and the accompanying instructions and warnings defectively, causing them to fail to perform as safely as an ordinary consumer would expect when in an unintended or reasonably foreseeable manner.

119.    OxyCide Cleaning Products, as manufactured and supplied by Ecolab was also defective due to inadequate post-marketing warnings or instructions because, after Defendant knew or should have known the risk of injuries from use, Defendant failed to provide adequate warnings to the community of OxyCide users and the consumers, to whom it was directly marketing and advertising, and further, it continued to affirmatively promote OxyCide Cleaning Products as safe and effective.

120.    A reasonable person who had actual knowledge of the increased risks associated with using the OxyCide Cleaning Products would have concluded that the OxyCide Cleaning Products should not have been marketed and/or sold to hospitals for use by hospital employees.

121.    Despite the fact that the Defendant knew or should have known of the defective nature of the OxyCide Cleaning Products, Defendant continued to design, manufacture and sell the OxyCide Cleaning Products as to maximize sales and profits and the expense of public health and safety.  Defendant thus acted with conscious and deliberate disregard of the foreseeable harm cause by the OxyCide Cleaning Products.

122.    The risks inherent in the design of the cleaning products outweigh significantly any benefit of such design.

35

123.    Plaintiffs were not aware of the aforementioned defects and could not, through the exercise of reasonable care, have discovered the risk of injury associated with OxyCide Cleaning Products.

124.    As a legal and proximate result of the aforementioned defective and/or unreasonably dangerous condition of the OxyCide Cleaning Products, the product was used by Plaintiffs and as a result of the cleaning products, Plaintiffs sustained the injuries and damages set forth herein.

125.    Information given by Defendant to the hospitals and their employees concerning the safety and efficacy of the OxyCide Cleaning Products, especially the information contained in the advertising, promotional, instructions, warnings, and safety data sheets, did not accurately reflect the risks associated with using the product.

126.    Had adequate information regarding the safety of the products been provided to Plaintiffs, they would not have used the OxyCide Cleaning Products.  Had adequate warnings and/or instructions been provided, Plaintiffs would not have used the OxyCide Cleaning Products.

127.    Defendant acted with conscious and/or deliberate disregard of the foreseeable harm caused by use of its products. As a direct and proximate consequence of Defendant's negligence, willful, wanton, and/or intentional acts, omissions, misrepresentations, and/or otherwise culpable acts, Plaintiffs and the class suffered the injuries and damages alleged herein.

128.    Plaintiffs therefore demand judgment against Defendant and seek compensatory, exemplary, and punitive damages, together with interest, and the costs of

suit and attorneys' fees and such other and further relief and this Court deems just and proper.

## COUNT II – STRICT LIABILITY – MANUFACTURING DEFECT

129.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

130.    At all times material to this action, Ecolab was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, instructing, warning, and/or selling the OxyCide Cleaning Products and otherwise putting the product into the stream of commerce.

131.    At all times material to this action, the OxyCide Cleaning Products were expected to reach, and did reach consumers and healthcare professionals throughout the United States, including Plaintiffs, without significant change in the condition in which the OxyCide Cleaning Products was distributed and/or sold.

132.    At all times material to this action, the OxyCide Cleaning Products were designed, developed, manufactured, tested, packaged, marketed, distributed, labeled, instructed, warned, and/or sold by Ecolab in a deceptive and unreasonably dangerous condition in one or more of the following particulars:

a.    When placed in the stream of commerce, the OxyCide Cleaning Products contained manufacturing defects in that it caused and/or increased the risk of experiencing adverse health effects, including but not limited to, respiratory irritations, shortness of breath, loss of voice, coughing, sneezing, inability to breath, swelling, burning of the eyes, nose and mouth, skin and nail

irritations, rash, nausea, vomiting, and other physical injuries which rendered the product unreasonably dangerous;

b.    When placed into the stream of commerce, the OxyCide Cleaning Products contained manufacturing defects which resulted in lot to lot variability which rendered the products unreasonably dangerous;

c.    The OxyCide Cleaning Products' manufacturing defects were created while the product was in the possession and control of Ecolab;

d.    The OxyCide Cleaning Products were not manufactured in accordance with Ecolab's specifications or performance standards and/or the product deviated from the approved plans and specifications therefore;

e.    The manufactured product composition post-marketing was materially different from the pre-market product; and

f.    The manufactured product deviated from the product design and manufacturing defects existed in the product before it left the Ecolab control.

133.    As a direct and proximate result of Ecolab's negligent acts, omissions, carelessness, recklessness, and gross negligence, including their failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiffs suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which they are entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial. Ecolab is liable for all general,

special, and compensatory damages and equitable relief to which Plaintiffs are entitled by law.

## COUNT III – STRICT LIABILITY – FAILURE TO WARN

134.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

135.    Ecolab designed, engineered, developed, manufactured, produced, assembled, equipped, tested, or failed to test, inspected or failed to inspect, repaired, retrofitted, or failed to retrofitted, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, instructed, provided the warnings, and sold the OxyCide Cleaning Products and its component parts and constituents, which was intended by Defendant to be used for the purposes of use as a disinfectant, and other related activities.

136.    At all times relevant hereto, Ecolab knew that OxyCide Cleaning Products would be used and operated by healthcare professionals without inspection for defects or risks beyond those identified by Ecolab.

137.    At the time of the incident described above, OxyCide was being used in a manner and fashion that was foreseeable by Ecolab, and in a manner in which it was intended to be used.

138.    A substantial number of hospital employees suffered adverse health effects from exposure to chemicals and compounds in Ecolab's OxyCide Cleaning Products.

139.    The dangers posed to people by the chemicals and compounds in Ecolab's defective OxyCide Cleaning Products are not generally known or, if known, reasonable

people would not expect the dangerous chemicals to be in the diluted product without proper warnings and instructions on use.

140.    Ecolab knew, or by use of scientific knowledge available at the time, should have known of the danger of the components/ingredients individually or wholly combined.

141.    Ecolab failed to provide adequate instructions and warnings concerning the chemicals' dangers.

142.    Ecolab's lack of adequate instructions and warnings was a substantial factor in legally and proximately causing Plaintiffs harm.

143.    Ecolab failed to properly warn users that in 2015 OxyCide was listed as an asthmagen, a substance that can cause asthma, by the Association of Occupational and Environmental Clinics.

144.    Ecolab failed to properly warn users that OxyCide is a known respiratory sensitizer, which can cause an immune response and adverse respiratory effects, even at low levels of exposure.

145.    Ecolab failed to provide adequate warnings of respiratory distress, vocal cord dysfunction, acute inhalation injuries, asthma and asthma-like symptoms, and its propensity to cause and/or contribute to serious injuries.

146.    Ecolab failed to properly warn users to keep a lid on the OxyCide Cleaners whenever possible to minimize the generation of PAA, hydrogen peroxide, and acetic acid vapors that can be inhaled and cause injury to one's health.

147. Ecolab failed to properly warn users that adequate engineering and administrative safeguards are required to mitigate against exposure to OxyCide's harmful vapors and gases.

148. Ecolab failed to make timely corrections to the design of the OxyCide Cleaner and OxyCide Dilution System to correct the known or knowable hazardous chemical compounds that were inhaled by health care employees and caused damage and injury to their health.

149. Plaintiffs were not aware of the aforementioned dangers.

150. As a legal and proximate result of the aforementioned inadequate warning on the cleaning products, Plaintiffs sustained the injuries and damages set forth herein.

151. Plaintiffs, therefore, are entitled to damages in an amount to be proven at the time of trial.

## COUNT IV – NEGLIGENCE

152. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

153. At all relevant times, Defendant had a duty to exercise reasonable care to users of the products, including Plaintiffs Betty Reich, Mary Parham, and Althea Cooper herein, in all conduct associated with putting the OxyCide Cleaning Products into the stream of commerce including, but not limited to, designing, developing, manufacturing, testing, inspecting, packaging, promoting, marketing, distributing, labeling, instructing, warning, and/or selling of the OxyCide Cleaning Products.

154.    At all relevant times, the Defendant had a duty to comply with all applicable laws and standards in all conduct associated with putting the OxyCide Cleaning Products into the stream of commerce including, but not limited to, designing, developing, manufacturing, testing, inspecting, packaging, promoting, marketing, distributing, labeling, instruction, warning, and/or selling of the OxyCide Cleaning Products.

155.    Defendant breached their duty of reasonable care to Plaintiffs in that they negligently designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled, instructed, warned, used and/or sold the OxyCide Cleaning Products.

156.    Plaintiffs' injuries and damages alleged herein were and are the direct and proximate result of the Defendant's negligent acts, omissions and violations of applicable laws and standards including, but not limited to, the following:

a.    Failure to exercise reasonable care in manufacturing, distributing, designing, selling, testing, instructing, warning, and servicing of the OxyCide Cleaning Products and its component parts in order to avoid the aforementioned risk to individuals;

b.    Failure to adequately warn and/or instruct users and/or healthcare professionals of the OxyCide Cleaning Products, including Plaintiff herein, of said products' known dangerous and defective characteristics;

c.    Failure to incorporate within the OxyCide Cleaning Products and its design reasonable safeguards and protections against dangerous and consequences thereof;

d.     Failure to exercise reasonable care in their design, development, implementation, administration, supervision and/or monitoring of clinical trials for the OxyCide Cleaning Products;

e.     Promoting the Cleaning Products in an aggressive, deceitful and fraudulent manner, despite knowledge of the OxyCide Cleaning Products' defective and dangerous characteristics including its propensity to cause serious injury;

f.     Representing that the product was safe for its intended use when, in fact, the Cleaning Products were unsafe for its intended use;

g.     Failure to make timely corrections to OxyCide Cleaning Products' design to correct hazardous defects;

h.     Concealment of known dangers and other claims of injury and health consequences from the use of OxyCide;

i.     Failure to adequately identify and mitigate hazards associated with OxyCide Cleaning Products in accordance with good design and manufacturing practices and other ways;

j.     Use of PAA – a dangerous oxidizing agent – at a concentration, level and administration hazardous to healthcare professionals and the public;

k.     Failure to perform appropriate pre-market testing of the OxyCide Cleaning Products;

l.     Failure to perform appropriate post-market testing of the OxyCide Cleaning Products; and,

m.    Failure to perform appropriate post-market surveillance of the OxyCide Cleaning Products;

n.    Failure to report to the general public those data which indicated risks associated with using the OxyCide Cleaning Products.

157.    Defendant knew, or should have known, that consumers such as Plaintiffs herein would suffer injury as a result of the Defendant's failure to exercise reasonable and ordinary care.  Despite such knowledge of the dangers of the OxyCide Cleaning Products, Defendant failed to remedy or warn of the product's known hazards that posed a grave threat of injury.  Defendant acted despite such knowledge that harm was substantially certain to occur.  Defendant had a duty to warn the public, the medical community, and the employees of the medical community about the increased risks and refused to do so placing profits, stock options and bonuses ahead of consumer safety.

158.    At all relevant times, the Defendant had a duty and obligation to refrain from violations of law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, instructing on use, warning of the risks and dangers of the OxyCide Cleaning Products, and otherwise distributing the products.

159.    As a direct and proximate result of Defendant's negligent acts, omissions, carelessness, recklessness and gross negligence, including their failure to comply with applicable laws and standards as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiffs suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical

injuries, economic losses and other damages for which they are entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial. Defendant is liable jointly and/or severally for all general, special and compensatory damages and equitable relief to which Plaintiffs are entitled by law.

160.     Plaintiffs seek actual and punitive damages from the Defendant and allege that the conduct of Defendant was committed with knowing, conscious, reckless, deliberate and/or grossly negligent disregard for the rights and safety of consumers, including the Plaintiffs herein, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

## COUNT V – BREACH OF EXPRESS WARRANTY

161.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

162.     Defendant expressly warranted that (1) the OxyCide Cleaning Products were safe and fit for use by healthcare professionals, consumers, users, including Plaintiffs; (2) the OxyCide Cleaning Products were fit for its intended purpose; (3) the OxyCide Cleaning Products were of merchantable quality; (4) the OxyCide Cleaning Products did not pose any unreasonable risks or dangers; and (5) the OxyCide Cleaning Products were adequately tested and found fit for its intended use.

163.     At the time that Defendant made the express warranties, Defendant knew or should have known of the purpose for which the OxyCide Cleaning Products were to be used and Defendant warranted the same to be, in all respects, as fit, safe, and effective and

proper for such purpose, as a disinfectant cleaner and automated dilution management system.

164.    At the time that Defendant made the express warranties, Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that the OxyCide Cleaning Products were not safe and not fit for its intended use and, in fact, posed serious risks of injuries to the user.

165.    Members of the healthcare community including, but not limited to, Plaintiffs, physicians, patients, and health care workers, reasonably relied upon the skill and judgment of Defendant, and upon said express warranties, in distributing, recommending, selling, advertising, and/or dispensing the OxyCide Cleaning Products.

166.    Defendant intended and expected members of the healthcare community to rely upon Defendant's express warranties.

167.    Defendant intended and expected Plaintiffs to rely upon Defendant's express warranties.

168.    Plaintiffs herein reasonably relied on the Defendant's express warranties.

169.    Defendant materially breached said express warranties in that the OxyCide Cleaning Products are not and, at all relevant times, were not safe and fit for its intended use and, in fact, caused debilitating and potentially lethal side effects with greater frequency than safer alternative methods of disinfectant.

170.    As a direct and proximate result of Defendant's wrongful conduct, material breach of express warranties, and failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the product, Plaintiffs

suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which they are entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial. Defendant is liable for all general, special and compensatory damages and equitable relief to which Plaintiffs are entitled by law. Plaintiffs seek actual and punitive damages from the Defendant as alleged herein.

## COUNT VI – BREACH OF IMPLIED WARRANTY

171. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

172. Defendant designed, manufactured, marketed, distributed, supplied and sold the OxyCide Cleaning Products as a daily disinfectant cleaner and automated dilution system.

173. At the time that the Defendant manufactured, marketed, distributed, supplied, and/or sold the Cleaning Products, they knew of the use for which the OxyCide Cleaning Products were intended and impliedly warranted that the products were of merchantable quality and safe and fit for such use.

174. Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of the Defendant.

175. Plaintiffs were exposed to the OxyCide Cleaning Products for its intended purpose.

176.    Due to the Defendant's wrongful conduct as alleged herein, Plaintiffs and the Class could not have known about the true nature of the risks and side effects associated with the OxyCide Cleaning Products until after they used and/or was exposed to the products.

177.    Contrary to and in material breach of Defendant's implied warranties regarding the OxyCide Cleaning Products, the products were not of merchantable quality; and was not safe or fit for its intended uses and purposes including, but not limited to, as a daily disinfectant.

178.    As a direct and proximate result of Defendant's wrongful conduct, material breach of implied warranties, and failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiffs suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which they are entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial.  Defendant is liable for all general, special and compensatory damages and equitable relief to which Plaintiffs are entitled by law.  Plaintiffs seek actual and punitive damages from the Defendant as alleged herein.

## COUNT VII – INTENTIONAL MISREPRESENTATION

179.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

180.    Defendant marketed, promoted, and/or advertised the OxyCide Cleaning Products to healthcare professionals and/or the general public.

181.    In disseminating information to healthcare professionals and the general public, Defendant had a duty to disseminate truthful information and a parallel duty not to deceive healthcare professionals, the U.S. Food and Drug Administration ("FDA"), the U.S. Environmental Protection Agency ("EPA"), the Occupational Safety and Health Administration ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), Plaintiffs, and/or the general public.

182.    In breach of their duties not to deceive, Defendant made material misrepresentation of fact, concealed material information and/or otherwise falsely and fraudulently represented to Plaintiffs, the medical and healthcare community, and to the public, that the OxyCide Cleaning Products had been tested and were found to be safe and effective for use as a daily disinfectant and automated dilution management system.

183.    In breach of their duties not to deceive, Defendant fraudulently concealed and misrepresented material information in their own studies that, *inter alia*, their OxyCide Cleaning Products significantly increased risks posed.

184.    With regard to Ecolab, Ecolab made material misrepresentations to healthcare professionals, consumers, Plaintiffs, and/or the general public, fraudulently concealed material facts, and intentionally omitted material information.  Such material misrepresentations, fraudulent concealments of material facts, fraudulent acts and omissions include, but are not limited to, the following:

49

a.    Ecolab falsely represented that the side effects and risks of the use of the OxyCide Cleaning Products were the same as and not greater than risks posed by other disinfectants;

b.    Ecolab falsely advertised, marketed, and/or claimed that their OxyCide Cleaning Products were safe, despite knowing they were unsafe to Plaintiffs, healthcare professionals, patients, and/or the general public;

c.    Ecolab fraudulently concealed material information and misrepresented the risks of acute respiratory failure events associated with the use of the OxyCide Cleaning Products;

d.    Ecolab fraudulently concealed and misrepresented in marketing and/or advertising claims that a low incidence of side effects was associated with the use of OxyCide Cleaning Products;

e.    Ecolab fraudulently concealed the increased risks of short-term and long-term exposure and other adverse events caused by the OxyCide Cleaning Products – despite the fact that Ecolab knew or should have known that scientific studies demonstrated a substantial risk;

f.    Ecolab fraudulently concealed and misrepresented the adverse results of clinical investigations of their products;

g.    Ecolab falsely represented its OxyCide Cleaning Products as superior to other disinfectants despite knowledge that it knew or should have known that scientific studies demonstrated their OxyCide Cleaning Products posed

50

significantly greater risks of respiratory complications and other serious side effects;

h.   Ecolab falsely represented known dangers and serious health consequences from the use of OxyCide Cleaning Products; and

i.   Ecolab failed to inform Plaintiffs, healthcare professionals, FDA, EPA, OSHA, NIOSH, and/or the general public that short-term and long-term exposure limits did not fully and accurately test PAA's occupational risk.

185.   Defendant knew these representations to be false when made and Defendant made such representations in willful, wanton, and reckless disregard of the truth.

186.   As a result of Defendant's research, testing, knowledge of prior complaints from healthcare workers at hospitals throughout the United States, and publicized complaints about the harmful symptoms experience from healthcare workers at other hospitals in other states from exposure to OxyCide, Defendant knew or should have known that the information they intentionally distributed was false including, but not limited to, assuring the healthcare professionals, hospitals, the FDA, the EPA, OSHA, NIOSH, Plaintiffs, and/or the general public hospitals that the OxyCide Cleaning Products were safe for use as a means of daily disinfectant and dilution system.

187.   On information and belief, Defendant omitted data from testing and research of their products and hid the true dangers of the products in reporting to the general public, healthcare professionals, Plaintiffs, OSHA, NIOSH, the EPA and the FDA.

188.   Defendant distributed and published reports, press releases, advertising campaigns, and other commercial media to the public, OSHA, NIOSH, the FDA, the EPA,

healthcare professionals, and/or Plaintiffs that contained material misrepresentations of fact and/or omissions of material fact concerning their OxyCide Cleaning Products.

189.    The information distributed to healthcare professionals, OSHA, NIOSH, the FDA, the EPA, Plaintiffs, and/or the general public by Defendant intentionally included representations that Defendant's products were safe for use as a daily disinfectant and dilution system.

190.    The information distributed to healthcare professionals, OSHA, NIOSH, the FDA, the EPA, Plaintiffs, and/or the general public intentionally included false representations that the products were not injurious to the health and/or safety of their intended users and that the OxyCide Cleaning Products' risks to their users' health and/or safety were the same as the risks posed by other daily disinfectants and dilution systems.

191.    Defendant intentionally suppressed, ignored and disregarded unfavorable test results as well as actual complaints from healthcare workers that demonstrated that its products were not safe as a means of daily disinfectant and dilution system.

192.    Plaintiffs were unaware of the falsity of said representations, reasonably believed said representations to be true and reasonably relied upon said representations and were induced to, used and/or exposed the OxyCide Cleaning Products, thereby sustaining severe and permanent personal injuries.

193.    Defendant knew and/or should have known that the OxyCide Cleaning Products had not been sufficiently tested, were unsafe, defective in design and manufacture, unreasonably dangerous and/or lacked adequate and/or sufficient warnings.

194.    Defendant knew and/or should have known that their OxyCide Cleaning Products could and would cause severe and permanent injury to users and that its products are inherently dangerous in a manner that exceeded all product warnings issued by Defendant.

195.    Defendant had sole access to material facts concerning the defective nature of their OxyCide Cleaning Products and their propensity to cause serious and dangerous side effects and to cause injury and damage to persons who used or were exposed to such products, including the Plaintiffs herein.

196.    Through the material misrepresentations and intentional concealments of material facts as alleged herein, Defendant intended to deceive and defraud healthcare professionals, OSHA, NIOSH, the FDA, the EPA, Plaintiffs, and/or the general public to falsely inspire confidence in the quality and fitness for use of their products and intended to induce healthcare professionals and the general public to use, purchase, request, dispense, prescribe, recommend, and/or continue to use their OxyCide Cleaning Products.

197.    Defendant willfully and intentionally concealed and failed to disclose material facts and made false representations with the purpose, intent and design of deceiving and lulling Plaintiffs, healthcare professionals, and/or the general public into a false sense of security so that Plaintiffs would rely on the representations, purchase and use the OxyCide Cleaning Products and so that healthcare professionals would dispense, prescribe, and/or recommend the product.

198.    Defendant knew or should have known that Plaintiffs, healthcare professionals, and the general public would rely upon the information that Defendant

disseminated through their public relations campaigns which included, but were not limited to, public statements and press releases.

199.    Plaintiffs, healthcare professionals, and/or the general public believed that the Defendant's representations were true at the time they were made, reasonably relied upon such representations and reasonably relied on the Defendant's superior knowledge of their products, reasonably relied on the Defendant's selective recitation of facts and absence of adverse facts that were negligently, fraudulently and/or purposefully concealed and/or omitted by the Defendant.  Plaintiffs, healthcare professionals, and/or the general public were thereby induced to purchase, use, dispense, prescribe, recommend, and/or exposed to the product.

200.    At the time the representations were made, Plaintiffs, healthcare professionals, and/or the general public did not know the truth with regard to the dangerous and serious health and/or safety risks of the OxyCide Cleaning Products.

201.    Plaintiffs had not discovered all of the true facts, all of the dangerous and serious health/safety risks, all of the false representations made, nor had Plaintiffs discovered all of the Defendant's wrongful conduct concerning the product, as such discovery is still ongoing and discovery of the Defendant acts, omissions and other wrongful conduct concerning the product is continuing in this matter.

202.    Had Plaintiffs known the true facts with respect to the dangerous and serious health and/or safety risks posed by the OxyCide Cleaning Products, Plaintiffs would have taken action to not be exposed to the Products.

203.    Defendant's concealment of material facts and misrepresentations as alleged herein concerning, *inter alia*, the safety of their products, were made purposefully, willfully, wantonly, and/or recklessly, in order to mislead Plaintiffs, healthcare professionals, hospitals, and/or the general public into reliance, continued use of the product, and actions thereon, while Defendant knew that said persons and entities were unable to determine the truth behind the Defendant's concealment and omissions, as set forth herein.  Said acts and omissions as alleged herein evinces a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiffs and the general public.

204.    As a direct and proximate result of Defendant's acts, omissions, wrongful conduct and failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiffs suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which they are entitled to recover including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial. Defendant is liable for all general, special and compensatory damages and equitable relief to which Plaintiffs are entitled by law.  Plaintiffs seek actual and punitive damages from the Defendant and alleges that the conduct of Defendant was committed with knowing, conscious, reckless, deliberate and grossly negligent disregard for the rights and safety of consumers, including the Plaintiffs herein, thereby entitling the Plaintiffs to punitive

damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

## COUNT VIII – NEGLIGENT MISPRESENTATION

205.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

206.    At all relevant times alleged herein, Defendant had a duty to, *inter alia*, truthfully, fully and accurately inform healthcare professionals, Plaintiffs, government officials, and the general public of all facts concerning the OxyCide Cleaning Products' testing, safety, risks and efficacy for its intended purpose.

207.    Defendant materially breached its duty to, *inter alia*, truthfully, fully and accurately inform Plaintiffs, the healthcare community, OSHA, NIOSH, the FDA, the EPA, and/or the general public of all facts concerning the products' testing, safety, risks and efficacy.

208.    At the times relevant herein, Defendant held a position of unique knowledge concerning the risks posed by the OxyCide Cleaning Products.  Defendant intentionally and/or negligently concealed the defects and hazardous effects of OxyCide Cleaning Products.  Plaintiffs had no knowledge of the safety risks associated with OxyCide Cleaning Products.  Defendant took advantage of the limited opportunity Plaintiffs had to discover Defendant's strategic and intentional and/or negligent concealment of the defects in the OxyCide Cleaning Products.

209.    Through their unique knowledge and expertise regarding the defective nature of the OxyCide Cleaning Products, and through their marketing of these products,

including statements to healthcare professionals in advertisements, promotional materials, and other communications, Defendant convinced hospitals and healthcare professionals nationwide that Defendant possessed facts demonstrating that its products are and, at all relevant times, were safe and effective for their intended use and were free of defects.

210.    Defendant's representations to Plaintiffs were unqualified statements made to induce Plaintiffs to use and/or be exposed to the OxyCide Cleaning Products. Healthcare professionals and hospitals reasonably relied upon the statements made by Defendant when purchasing and using the OxyCide Cleaning Products and Plaintiffs reasonably relied upon those same statements. Defendant took unconscionable advantage of its dominant position of knowledge with regard to Plaintiffs and engaged in constructive fraud in their relationship with Plaintiffs.

211.    Defendant's concealments, misrepresentations and omissions were undertaken in order to induce Plaintiffs, and the general public to use and be exposed to Defendant's OxyCide Cleaning Products and choose, recommended, and/or use said products over other safer alternative disinfectants and methods on the market and, at all relevant times, Plaintiffs reasonably relied on Defendant's acts and omissions.

212.    Defendant failed to exercise ordinary care in their representations concerning their OxyCide Cleaning Products and engaged in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of their products into interstate commerce while negligently misrepresenting that the products had been fully tested and found to be safe, that the products were safe and free of material risks to their users, thereby breaching

their duties to truthfully and accurately represent the products' side effects and risks to Plaintiffs, the medical and healthcare community and/or to the general public.

213.    Ecolab's promotional and marketing campaigns contained material misrepresentations concerning the safety, risks, soundness and reliability of their products. Said promotional and marketing campaigns concealed the true material information known by Ecolab concerning the risks posed by their products.  To date, Ecolab continues to misrepresent OxyCide Cleaning Products through their promotional and marketing campaign.

214.    Ecolab misrepresented and concealed material deviations in the manufactured OxyCide Cleaning Products from the approved designs and therefore also concealed the resulting high risk of injuries and adverse events posed by said manufacturing defects in the products.

215.    As a direct and proximate result of Defendant's acts, omissions, wrongful conduct and failure to comply with applicable laws and standards, as well as the unreasonably dangerous and defective characteristics of the OxyCide Cleaning Products, Plaintiffs suffered severe and permanent physical injuries, pain and suffering/severe emotional distress arising from such physical injuries, economic losses and other damages for which they are entitled to recover, including general, compensatory and special damages as well as equitable and declaratory relief all in an amount and nature to be proven at trial.  Defendant is liable for all general, special and compensatory damages and equitable relief to which Plaintiffs are entitled by law.  Plaintiffs seek actual and punitive damages from the Defendant and allege that Defendant's conduct was committed with

knowing, conscious, reckless, deliberate and grossly negligent disregard for the rights and safety of consumers, including Plaintiffs herein, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish the Defendant and deter it from similar conduct in the future.

## COUNT XI – FRAUDULENT CONCEALMENT

216.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

217.    Defendant fraudulently concealed information with respect to the OxyCide Cleaning Products, including, but not limited to, the following particulars:

a.    Defendant represented through oral representations, labeling, advertising, marketing materials, and publications that OxyCide Cleaning Products had been tested and found to be safe.  b.    Defendant represented through oral representations, labeling, advertising, marketing materials, and/or publications that OxyCide Cleaning Products were safe without use of protective equipment.

c.    Defendant had sole access to material facts concerning the dangers and unreasonable risks of OxyCide Cleaning Products.

d.    The concealment of information by Defendant about the risks of OxyCide Cleaning Products was intentional, and the representations made by Defendant was known to be false.

218.    The concealment of information and the misrepresentations about OxyCide Cleaning Products were made by Defendant with the intent that healthcare professionals,

governmental agencies, NIOSH, OSHA, EPA, FDA, and the general public, including Plaintiffs, would rely upon them.

219.    Plaintiffs relied upon the representations and were unaware of the substantial risks of the OxyCide Cleaning Products which Defendant concealed.

220.    Defendant's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of healthcare professionals, including Plaintiffs.

221.    As a direct and proximate result of the acts and conduct of Defendant, Plaintiffs have been injured in their respective health, and have suffered, continue to suffer and, on information and belief, will suffer indefinitely into the future, severe, lasting, and debilitating physical and mental pain and suffering, for which Plaintiffs are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

222.    As a further direct and proximate result of the acts and conduct of Defendant, Plaintiffs have lost earnings and earning capacity and will continue to incur such losses for an indefinite period of time in the future, in an amount to be proven at trial.

223.    As a further direct and proximate result of the acts and conduct of Defendant, Plaintiffs have incurred medical, hospital, and related expenses and, on information and belief, will continue to incur such expenses in the future, for which Plaintiff is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

224.    WHEREFORE, Plaintiffs demand judgment against Defendant and requests compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT XII – PUNITIVE DAMAGES

225.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

226.    At all times material hereto, Defendant knew or should have known of the serious safety concerns of OxyCide Cleaning Products.

227.    At all times material hereto, Defendant misrepresented facts concerning the safety of OxyCide Cleaning Products.

228.    Defendant's misrepresentations included knowingly withholding material information from healthcare professionals, governmental agencies, and/or the general public, including Plaintiffs herein, concerning the safety of the OxyCide Cleaning Products.

229.    At all times material hereto, Defendant knew and recklessly disregarded the fact that OxyCide Cleaning Products were hazardous to persons exposed to the chemicals. As a result, OxyCide Cleaning Products exposed Plaintiffs, and others similarly exposed, to an unnecessary risk.

230.    Notwithstanding the foregoing, Defendant continued to market the OxyCide Cleaning Products and exposed Plaintiffs to the dangerous product, without disclosing the aforesaid dangers, putting them at significant risk of suffering serious injuries.

231.    Defendant intentionally concealed and/or recklessly failed to disclose to healthcare professionals, governmental agencies, and/or the general public, including Plaintiffs herein, that OxyCide Cleaning Products were unsafe for their intended use.

232.    As a direct and proximate result of the Defendant's conscious and deliberate disregard for the rights and safety of healthcare professionals, such as the Plaintiffs, Plaintiffs suffered severe and permanent physical injuries.  Plaintiffs have suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and/or economically injured.

233.    As a result of the foregoing acts and omissions Plaintiffs requires and/or may require health care and services and did incur medical, health, incidental and related expenses.  Plaintiffs are informed and believe and further allege that Plaintiffs will in the future be required to obtain further medical and/or hospital care, attention, and services.  Accordingly, Plaintiffs demand judgment against the Defendant for compensatory, treble and/or punitive damages, including costs and attorney's fees, and all such other relief as the Court may deem proper

## VII.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

234.    Plaintiffs file this lawsuit within all applicable limitation periods of first suspecting that OxyCide Cleaning Products caused their injuries.  Plaintiffs could not, by the exercise of reasonable and due diligence, have discovered at an earlier point in time that OxyCide Cleaning Products were the cause of their injuries because the cause was unknown to Plaintiffs until recently.  Plaintiffs did not suspect, nor did Plaintiffs have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing

these injuries, until recently.  Plaintiffs and members of the Class exercised due diligence to discovery Defendant's wrongdoing.  However, such wrongdoing and/or the full extend and degree of such wrongdoing was not discoverable prior to the date of the filing of this action and/or prior to four years prior to the filing of this action since Defendant concealed its wrongdoing through misrepresentation.  Plaintiffs exercised due diligence by promptly filing this Complaint after discovery the facts giving rise to these claims.

235.    Additionally, any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of material facts by Defendant.  Through its affirmative misrepresentations and omissions, Defendant actively concealed from healthcare professionals, governmental agencies, and/or the general public, including Plaintiffs, the risks associated with OxyCide Cleaning Products.  Defendant have kept Plaintiffs ignorant of vital information essential to his pursuit of these claims, without any fault or lack of diligence on Plaintiffs' part.  Defendant's fraudulent concealment did result in such delay.  Plaintiffs could not reasonably have discovered these claims until shortly before filing this complaint.

## VIII.    PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually, and on behalf of others similarly situated requests that this Court enter judgement against Defendant and that Plaintiffs and the Class members be awarded equitable relief, and damages under all other causes of action, from Defendant, as follows:

A.    Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    Appoint Plaintiffs Betty Reich, Mary Parham, and Althea Cooper as the representatives of the Class and their counsel as Class counsel;

C.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs are entitled;

D.    Award pre-judgement and post-judgement interest on such monetary relief;

E.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Ecolab to refrain from the distribution and use of the Product or in the alternative, include adequate warnings and precautions, and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs with appropriate curative notice regarding the existence of toxic and dangerous chemicals;

F.    Declare Defendant to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

G.      Award reasonable attorneys' fees and costs; and

H.      Grant such further relief this Court deems appropriate.

## IX.    JURY DEMAND

Plaintiffs Betty Reich, Mary Parham, and Althea Cooper demand a trial by jury on all issues so triable.

Dated:  February 20, 2020                    Respectfully submitted,

                                             /s/ *Timothy Becker*
                                             Timothy Becker, Esq. (MN Bar #256663)
                                             Jacob Rusch, Esq. (MN Bar #391892)
                                             JOHNSON BECKER, PLLC
                                             444 Cedar St., Ste. 1800
                                             St. Paul, MN  55101
                                             Telephone: (612) 436-1800
                                             Facsimile: (612) 436-1801
                                             tbecker@johnsonbecker.com
                                             jrusch@johnsonbecker.com

                                             *In association with:*

                                             MCCUNE WRIGHT AREVALO LLP

                                             Richard D. McCune, Esq.* (CA Bar #132124)
                                             Michele M. Vercoski, Esq.* (CA Bar #244010)
                                             Tuan Q. Nguyen, Esq.* (CA Bar #312153)
                                             18565 Jamboree Road, Suite 550
                                             Irvine, California 92612
                                             Telephone: (909) 557-1250
                                             Facsimile: (909) 557-1275
                                             rdm@mccunewright.com
                                             mmv@mccunewright.com
                                             tqn@mccunewright.com

                                             Attorneys for Plaintiffs and the Putative Class

                                             **Pro Hac Vice* Application to be Filed